**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

Richard E. Blackburn, # 199392,    )
          )
      Plaintiff,    )
          )      C.A. No.: 0:06-2011-PMD-BM
v.          )
          )      __ORDER__
State of South Carolina; SC Department of  )
Corrections; John Ozmint, Director of  )
SCDC; Robert Ward, Regional Director of  )
SCDC, Robin Chavis, ECI Associate  )
Warden; Ms. Sprattling, ECI Grievance  )
Clerk; Sandra Bowie, Chief Grievance  )
Branch; Pravin R. Patel, ECI Physician; and  )
Dr. Glenn Alewine, Deputy Director of  )
Medical Services,  )
          )
      Defendants.  )
_____)

      This matter is before the court upon the recommendation of the Magistrate Judge to dismiss the Plaintiff's above-captioned case. The record contains a Report and Recommendation ("R&R") of United States Magistrate Judge Bristow Marchant ("the Magistrate Judge"), which was made in accordance with 28 U.S.C. § 636(b)(1)(B).[1] A dissatisfied party may object, in writing, to an R&R within ten days after being served with a copy of that report. 28 U.S.C. § 636(b)(1). Plaintiff filed timely objections in response to the R&R. For the reasons set forth herein, the Magistrate Judge's R&R is adopted, and Defendants' Motion for Summary Judgment is granted.

## BACKGROUND

      Plaintiff Richard E. Blackburn ("Blackburn") is currently an inmate serving a life sentence at Evans Correctional Institution ("ECI") on a conviction for murdering a highway

---

[1] Pursuant to the provisions of Title 28, United States Code, § 636(b)(1), and Local Rule 73.02(B)(2)(e), D.S.C., the Magistrate Judge is authorized to review all pretrial proceedings involving litigation by individuals proceeding *pro se*, and submit findings and recommendations to this Court.

patrol officer.  In his 43 page Amended Complaint, Plaintiff asserts that the conditions of his confinement have violated his constitutional rights, and asserts a claim for relief under 42 U.S.C. § 1983.  In his Amended Complaint, Plaintiff makes multiple allegations: (1) that Defendants failed to accommodate him as required by the ADA, resulting in a fall which injured his arm; (2) that Defendants punished him in retaliation for exercising his First Amendment right to free speech; (3) that Defendants committed deliberate indifference to many of his legitimate medical needs; (4) that he was denied showers; (5) that he was denied the opportunity to exercise; (6) that he was denied shoes; (7) that he was subjected to secondary smoke in his residential unit; (8) that he was denied meaningful access to the court system by ECI's inadequate law library; and (9) that he was denied the right to receive and enjoy certain materials containing "tasteful nude" photographs, such as *Playboy* magazine.

Plaintiff has been incarcerated at ECI since 2003.  Plaintiff has numerous medical ailments.  According to Plaintiff:

> I am Disabled, Wheelchair Bound.  I have no Hip Joint in Left Leg, Right Arm Disabled and Bone Infection, that requires Lifetime Antibiotic.  Diabetic since 1995, severe Sleep Apnia [sic], Morbidly Obese, Visual and Hearing Impaired, 2 Hernias, Scoliosis, High Blood Pressure, Nerve Damage, severe Neuropathy, Chronic Pain, Chronic Alergies [sic], Asthma, Irritable Bowel Syndrom [sic], Arthritis, Foliculitis and other numerous physical problems.

(Pl's Aff. ¶ 3.)

In July 2003, Plaintiff wrote a letter to the local newspaper complaining that ECI guards did not check on inmates frequently enough.  According to Plaintiff, there were a high number of child molesters in the facility, and if guards were only checking to make sure inmates were still in their cells every four to six hours, this gave inmates ample time to escape, which posed a threat to residents living close to the facility.  After the letter was published, on July 11, Plaintiff

was segregated from ECI's general population.  Plaintiff asserts that this was done as punishment for writing the letter, but SCDC officials claim that he was segregated because they thought he might have based the letter on some specific knowledge of an escape plan, and they were also concerned that other inmates were angry that he had written the letter, and he was put in protective custody.

In the segregated management unit (SMU), Plaintiff alleges that the room in which he was placed failed to accommodate his various medical ailments.  Plaintiff is confined to a wheelchair, and said that due to the small size of the room and a table which was permanently set in the middle of the room, he was unable to adequately move around the room.  He also claims that the toilet did not have a grab bar, which caused him to fall.  He further alleges that he only received showers approximately once per week while in SMU.  He also alleges that he was not allowed any out of cell recreation while he was in SMU and was completely confined to his cell. While in SMU, he claims that he was not allowed to have a power cord for his CPAP breathing machine for his sleep apnea during the day, which caused him respiratory distress.  He also claims that he was not given pillows or a cane, both of which helped him cope with his ailments.

Plaintiff also claims that Defendant Doctor Pravin R. Patel ("Patel"), an ECI physician, was deliberately indifferent to a legitimate medical need in providing care for his medical conditions.  Starting in February 2005, Patel decided that Plaintiff no longer required twice-daily testing of his blood sugar, and began testing him less regularly.  According to Plaintiff, this caused his blood glucose to fluctuate dramatically, often requiring immediate care.  Plaintiff was also unsatisfied with the medication prescribed to him by Patel, Nortyptilin, which he claims did not alleviate his symptoms.  Plaintiff also claims Defendants were deliberately indifferent by refusing to allow him to visit a dentist to have his teeth cleaned.

Plaintiff complained of this medical treatment to Defendant Doctor Glenn Alewine, Patel's supervisor. However, Alewine determined that Patel's decision not to change Plaintiff's medication was supported by the available medical evidence, and that Plaintiff had suffered no physical or mental injury as a result of his allegedly deficient care. In September 2006, Plaintiff's medication was switched from Nortryptiline to Neurontin.

Plaintiff has also asserted that he has been denied meaningful access to courts due to ECI's inadequate law library. Plaintiff claims that ECI's books of cases only contain cases decided up to 2003, and that his access to the law library is limited to two hours per week. Furthermore, he claims that the copying costs are excessive, which inhibits his ability to litigate his cases. He asserts that this lack of access to a law library was responsible for him losing a prior federal case.

Plaintiff has also made numerous other allegations of constitutional violations. Plaintiff has asserted that ECI officials denied his request to place him on a special diet to help lower his weight and control his diabetic symptoms. He has also alleged that he was subjected to secondary smoke, which exacerbated his medical conditions. He has asserted that he was not given shoes by ECI officials. Finally, he has claimed that his mother provided him with a subscription to *Playboy* magazine, but that ECI officials refused to allow him to receive the magazine or any other material which contained "tasteful nude" photography and/or artwork.

Plaintiff filed his 43 page Amended Complaint in this matter on December 28, 2006. Defendants filed an Answer to this Complaint on January 11, 2007. On May 28, Defendants filed a Motion for Summary Judgment on Plaintiff's claim. On August 1, Plaintiff filed a 55 page Response to Defendants' Motion (which also included 435 pages of exhibits and affidavits in support of his Response) to which Defendants filed a Reply on September 10. On October 3,

4

Magistrate Judge Bristow Marchant entered a Report and Recommendations ("R&R") on Plaintiff's claims which recommended that Defendants' Motion be granted, and that Plaintiff's exhausted § 1983 claims be dismissed with prejudice, while his claims which should be barred from this action due to failure to exhaust administrative remedies be dismissed without prejudice. On November 18, Plaintiff filed a 37 page Objection to the Magistrate Judge's R&R.[2]  Plaintiff also filed a "Motion for Judicial Notice of Issues Not Addressed in the Report Recommendation and Rule 56(c)" on this same date, claiming that he had asserted numerous claims in his Complaint and subsequent pleadings that had not been addressed by the Magistrate Judge's R&R.

## STANDARD OF REVIEW

### I.      Magistrate Judge's Report & Recommendation

Magistrate Judges are empowered by statute to preside over pretrial matters on appointment by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  Where, as here, a Magistrate Judge is "assigned without consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party or a prisoner petition challenging the conditions of confinement. . .[t]he magistrate judge shall enter into the record a recommendation for disposition of the matter."  Fed. R. Civ. P. 72(b).  The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court.  *Mathews v. Weber*, 423 U.S. 261, 269 (1976).

Under Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), a District Court evaluating a Magistrate Judge's recommendation is permitted to adopt those portions of the

---

[2] Prior to filing his Objections, Plaintiff requested, and was granted, an extension to file this pleading, and so his Objection was filed in a timely fashion.

recommendation to which no "specific, written objection" is made, as long as those sections are not clearly erroneous or contrary to law. *Thomas v. Arn*, 474 U.S. 140, 149 (1985). However, where a party makes a specific, written objection within ten days of being served with a copy of the report, the district court is required to make a *de novo* determination regarding those parts of the report, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter with instructions. 28 U.S.C. § 636(b)(1). The court has reviewed the entire record, the R&R, and Plaintiff's Objections. The Court adopts the R&R into this Order.

## II.    Summary Judgment

To grant a party's motion for summary judgment, the Court must find that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The Court is not to weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.' " *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725

6

(4th Cir. 1990)).  Summary judgment is not "a disfavored procedural shortcut" but an important mechanism for weeding out "claims and defenses [that] have no factual bases."  *Celotex*, 477 U.S. at 327.

## ANALYSIS

### I.     Exhaustion of Administrative Remedies

The Court first turns to the issue of whether or not Plaintiff's claims are barred for failure to exhaust administrative remedies.  The Prison Litigation Reform Act of 1995 mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures before filing suit to contest the conditions of their confinement.  28 U.S.C. § 1915A; 42 U.S.C. § 1997e(a).  Thus, there is no question that unexhausted claims cannot be brought in court.  *Jones v. Bock*, 549 U.S, 199, 212 (2007) (citation omitted).  The Supreme Court has held that "to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'-rules that are defined not by the PLRA, but by the prison grievance process itself."  *Id.* at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81).  The burden of demonstrating that the Plaintiff has failed to exhaust his remedies ultimately lies with Defendants.  *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.3d 674, 683 (4th Cir. 2005).

The Magistrate Judge recommended that all of Plaintiff's claims be dismissed except for those claims based upon grievance number 929-03, which concerned Plaintiff's placement in SMU and his treatment while he was there.  When Plaintiff submitted his Amended Complaint, the form asked if a grievance had been filed related to the underlying factual basis for the complaint.  Plaintiff responded yes to the question, and when prompted to note the grievance the Complaint was based upon, wrote that it was based upon grievance number 929-03.

7

However, in the substantive portion of the Amended Complaint, Plaintiff went on to make claims that went far beyond the underlying facts that comprised grievance 929-03. Many of these factual allegations had been previously brought to Defendants' attention by Plaintiff through other grievances. Plaintiff attached copies of all of these grievances to his Response in Opposition to Defendants' Motion for Summary Judgment.

This Court recognizes that *pro se* inmates are at a disadvantage in the litigation process. They have not been legally educated and trained, and do not enjoy the same access to resources and materials as that enjoyed by practicing attorneys. Because of this, this Court construes pleadings filed by *pro se* inmates as liberally as possible to give them every opportunity to litigate the substance of their claim. *See, e.g.*, *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). Therefore, this Court will not bar Plaintiff from litigating claims based on grievances he had filed and exhausted with ECI officials because he did not explicitly note on his Amended Complaint that his case was based on those grievances in addition to grievance number 929-03. Accordingly, this Court declines to adopt the Magistrate Judge's recommendation that Plaintiff may only litigate claims based upon grievance number 929-03 in this matter.

Plaintiff submitted fifteen grievances to ECI administrators regarding his complaints of mistreatment. All of these grievances were properly filled out and submitted to the appropriate authorities. The grievances were as follows:

(1) In grievance number 781-98, filed on June 16, 1998, Plaintiff complained that he had gum disease, and that ECI would neither provide him with or allow him to receive through mail toothpaste which contained hydrogen peroxide and baking soda. This was denied on the grounds that the treating dentist stated that this sort of toothpaste would not help Plaintiff with his gum problems. Plaintiff accepted this resolution and abandoned his claim. (Ex. 2.)

(2) In grievance number 1329-99, filed on October 29, 1999, Plaintiff complained that he was having toothaches, and that his teeth were on the verge of falling out, and he requested some unspecified intervention to save his teeth. This grievance

8

was denied on the grounds that SCDC dental care is limited to preventive and maintenance care, and that these measures would not benefit Plaintiff. Plaintiff submitted a Step 2 Grievance Form on this matter, which was denied, with the grievance coordinator stating that the dentist had determined that the only way to preserve Plaintiff's dental health was to extract two teeth, and that there was no other available procedure. (Ex. 6.)

(3) In grievance number 825-03, filed on March 14, 2003, Plaintiff complained that he had run out of his medication, and asked that safeguards be put in place to ensure that this did not happen again. The grievance coordinator confirmed that his medication had since been reestablished in a timely fashion, and wrote that he would not have such a problem with this in the future. Plaintiff signed the grievance form and indicated that he accepted this action, and took no further action on this claim. (Bowie Aff. Ex. 1.)

(4) In a grievance which was not formally assigned any number, filed on October 28, 2003, Plaintiff complained that Patel had provided him with inadequate treatment for his elbow and back pain, that Patel was restricting him to diet meals and had prohibited from eating the ordinary meals served in the cafeteria. He further alleged that Patel had refused to fix his CPAP breathing machine, and refused to put him on glucophage treatment for his diabetic symptoms. While Bowie claims that this grievance was treated along with the previous grievance, Plaintiff has explicitly denied that this is so, and the form contains no indication that Plaintiff accepted any actions on behalf of Defendants. In fact, Plaintiff specifically indicates on the form that he wishes to pursue the grievance.

(5) In grievance number 929-03, filed on November 3, 2003, Plaintiff complained that he had been placed in the Special Management Unit (SMU), which did not adequately accommodate his disabilities, and was denied adequate shower time and any recreation. Defendants acknowledge that this grievance was never given a proper response. There was a backlog in grievances at the time, and given that Plaintiff was no longer in SMU when the grievance was given attention by ECI authorities, this particular grievance was not a high priority.

(6) In grievance number 630-05, filed on March 7, 2005, Plaintiff alleged that Defendant Patel was intentionally trying to harm him by removing him from twice-daily blood testing and removing him from sliding scale insulin treatments. Plaintiff further claimed that Patel allowed Plaintiff to contract a bone infection, and Plaintiff had to receive antibiotic treatment for the infection. The warden responded by informing Plaintiff that he was not empowered to make medical decisions regarding the course of treatment. Plaintiff then filled out several request to staff member forms addressed to Patel and other medical personnel asking for the requested treatment, but it was refused on the grounds that Plaintiff had not been following his required diet (Plaintiff continued to buy junk food and candy from the ECI canteen) and medication, and that he had not been showing any symptoms of abnormally high blood sugar that would require him being tested twice daily. At this point, Plaintiff submitted a Step 2 Grievance Form. This was also denied, on the grounds that Plaintiff refused to stop buying and consuming unhealthy junk food which caused his blood sugar to spike, and that

9

putting him on the sliding scale insulin treatment only allowed him to "chase" junk food with insulin and would thus allow him to continue to consume large amounts of unhealthy food,[3] which would only exacerbate his underlying health problems. (Ex. F.)

(7) In grievance number 783-05, filed on March 21, 2005, Plaintiff stated that he believed he had an infected tooth and infected jaw, and wanted to see a dentist. The warden denied Plaintiff's grievance because Plaintiff had in fact been to a doctor a week after filing the grievance, on March 28, and was given a painkiller and an antibiotic, so the issue was moot. Plaintiff completed and submitted a Step 2 Grievance Form on this matter, which was denied. In denying Plaintiff's grievance, the grievance coordinator noted that Plaintiff had been to sick call numerous times (often multiple times per week) during the period in question when Plaintiff claims to have been in severe pain, and yet made no mention to any medical personnel of pain in his teeth during these sick call visits. Furthermore, the dentist recommended extraction to resolve the infection and the pain, and Plaintiff refused.

(8) In grievance number 1618-05, filed on June 17, 2005, Plaintiff complained that he needed to have his tooth pulled, but that he could not get in to see the dentist to have this procedure performed. The grievance coordinator denied this grievance, noting that Plaintiff had been admitted to see a dentist on July 11, and had his tooth pulled at that time. Plaintiff noted that he accepted this course of action and considered the action closed, and took no further actions on this claim.

(9) In grievance number 2214-05, filed on August 25, 2005, Plaintiff complained that Defendant Patel had refused to change his prescription for his neuropathy from Nortriptyline to Neurontin as he requested. Plaintiff alleged that he was still having pain with the Neurontin, and that he had repeatedly asked Patel to prescribe him the other medication, to no avail. The warden again refused this grievance on the grounds that it is not within the warden's purview to order a treating physician to change medications. Plaintiff again completed and submitted a Step 2 Grievance Form on this claim, and was gain denied. The grievance coordinator informed him that he, too, had no power to substitute the Plaintiff's medical judgment for a licensed treating physician, and because Patel believed that Nortriptyline was the most appropriate medication for Plaintiff's symptoms, the prescription would not be changed.

(10) In grievance number 375-06, filed on February 6, 2006, Plaintiff complained that ECI had not made adequate accommodations for his disability, including claims that the layout and space of his quarters was inadequate, he could not properly use water fountains or shower stalls, and was unable to fully take advantage of the cafeteria and library. The warden's response stated that ECI was in full compliance with American Correction Association ("ACA") standards for disabled inmates. Plaintiff was unsatisfied with this response, and filed a Step 2

---

[3] Plaintiff has, in fact, conceded that he regularly buys junk food and candy from the canteen, but asserts that the larger cause of his blood sugar irregularities are due to the unhealthy nutritional content of the regular meals served at ECI. (Ex. 62 at 7.)

Grievance Form, which was denied on the grounds that Plaintiff had failed to make specific allegations as to how ECI was failing to accommodate his disability. (Ex. 37.)

(11) In grievance number 689-06, filed on March 24, 2006, Plaintiff again complained that Patel and Alewine refused to change his prescription from Nortriptyline to Neurontin. The warden refused to overturn the decisions of Plaintiff's treating physicians, and denied the grievance. Plaintiff completed and submitted a Step 2 Grievance Form, which was denied on the grounds that the grievance coordinator could not overrule the medical decisions of the treating physicians.

(12) In grievance number 1091-06, filed on May 11, 2006, Plaintiff complained that ECI medical personnel had not granted his request to have his teeth cleaned. After having his grievance denied by the warden, Plaintiff submitted a Step 2 Grievance Form. This was denied by the grievance coordinator, who wrote that ECI was currently in the process of trying to find a new full-time dental care provider, and until that happened, they were only able to provide inmates with dental care for urgent dental issues, which did not include preventive measures like cleaning. (Ex. 11.)

(13) In grievance number 1505-06, filed on July 7, 2006, Plaintiff complained that he was exposed to secondary smoke, which exacerbated his numerous medical problems and threatened his health. Plaintiff was unsatisfied with Warden's response, and so filed a Step 2 Grievance Form, which was denied on the grounds that the unit had specifically designated areas in which inmates were allowed to smoke, and that if inmates were not following these regulations, Plaintiff should report them to the authorities. Furthermore, it was noted that Plaintiff himself had regularly purchased cigarettes from the ECI canteen, and was classified as a smoker.[4] (Ex. 57.)

(14) In grievance number 1818-06, Plaintiff complained that ECI had refused to grant his request for a "weight loss" diet, and instead continued to serve him the same meals as were given to the other inmates in the general population, which he claims consisted of processed meat which did not allow him to lose weight and exacerbated his diabetic symptoms. The warden denied Plaintiff's grievance, stating that ECI did not offer any sort of weight loss program or diet, and again stating that much of Plaintiff's problem was resulting not from his meals, but from the unhealthy snacks he was purchasing from the canteen. Plaintiff filed a Step 2 Grievance Form on this claim, which was denied on the grounds that ECI offers no weight loss diet. (Ex. 5.)

(15) In grievance number 1807-07, Plaintiff complained that he needed his teeth cleaned and that he also needed bridge work done. The warden denied Plaintiff's grievance on the grounds that he had been given medical care in accordance with ECI policy, and Plaintiff filed a Step 2 Grievance Form on this matter. The grievance coordinator also denied Plaintiff's grievance on the grounds that until

---

[4] Plaintiff acknowledges that he used to smoke, but contends that at the time of filing this grievance form, he had voluntarily quit smoking.

ECI could find a full-time dentist, SCDC had to prioritize dental care, and thus could only provide remedial care for urgent issues, and would reinstate preventive dental care as soon as a full-time dentist was hired.  (Ex. 12.)

It now falls to this Court to match up the claims Plaintiff has made in his myriad grievances with the numerous claims he has made in his Amended Complaint.

As an initial matter, this Court notes that only grievances which were exhausted within a certain window of time may form the basis of the present matter.  In claims brought under § 1983, the state law for the statute of limitations applies.  *See Owens v. Okure*, 488 U.S. 235 (1989).  Applicable South Carolina provides that a claim must be brought within three years of the date upon which the cause of action arose.  S.C. Code Ann. § 15-3-530.  However, while an inmate is waiting for a resolution on his grievance, the statute of limitations tolled.  Therefore, the relevant date is the date upon which the administrative remedy is finally exhausted.  In this case, then, since Plaintiff initiated this action on July 13, 2006, the relevant date after which Plaintiff must have received final resolution on his grievances is July 13, 2003.  Any grievances which were exhausted before that date are time barred, and may not form the basis of any claim for relief under § 1983 in this Court.

Reviewing the grievances Plaintiff has submitted, three grievances fall into this category.  Grievances numbered 781-98, 1329-99, and 825-03 were all exhausted well before July 13, 2003.  Accordingly, any of Plaintiff's claims based upon these grievances are time barred and may not be litigated in this matter.[5]

---

[5] Furthermore, the Court notes that in two of the three noted grievances, 781-98 and 825-03, Plaintiff's initial grievance was denied and he noted that he accepted the action taken.  He did not file a Step 2 Grievance Form in either case.  Therefore, even if these claims were not time-barred, they would be barred because Plaintiff had accepted the administrative resolution and therefore did not exhaust his administrative remedies on either claim.

The Court next notes that in order to be the basis of a § 1983 claim, a claim must be administratively exhausted *prior to* the initiation of the action in federal court. "No action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. In 1983 cases, "exhaustion is a prerequisite to suit." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Therefore, the law is clear that any grievances which had not been exhausted by Plaintiff prior to his filing of his Complaint in this action may not be ruled upon by this Court. Plaintiff filed his Amended Complaint, which outlines his claims against Defendants, on December 28, 2006. Grievance number 1807-07 was filed in late 2007, well after Plaintiff had initiated this action in federal court, and the facts alleged in that grievance are therefore barred from being litigated under § 1983 in the present action.

The Court next points out that in order to be said to have exhausted the available administrative remedies, an inmate must appeal any adverse grievance determinations. In the present case, Plaintiff failed to do so with grievance number 1618-05. When the grievance coordinator responded to Plaintiff's grievance, Plaintiff noted that he accepted the action taken, and did not appeal the decision nor make any further claims on the issue. Therefore, Plaintiff did not exhaust all available administrative remedies on this claim, as he explicitly communicated to Defendants that he was satisfied with their response. Accordingly, Plaintiff may not seek § 1983 relief on the same allegations, and Plaintiff may not recover damages under § 1983 for any claim based upon the allegations originally made in grievance number 1618-05.

Plaintiff also did not file a Step 2 Grievance on grievance number 929-03. However, in her affidavit, Defendant Bowie conceded that there was backlog of hundreds on unprocessed grievances when she took the position, and she had to prioritize which grievances were urgent

13

and which ones were not.  Since Plaintiff was no longer in SMU, she determined that Plaintiff's grievance, which concerned allegations about events that occurred while Plaintiff was in SMU, to be low-priority, and Plaintiff never received a response to the grievance.  While inmates are expected to exhaust all available administrative remedies before bringing action in federal court, there are limits to this rule.  If the prison administrators do not or will not respond to a defendant attempting to administratively resolve his grievances, it would be fundamentally unjust for this court to deny such a party access to a remedy when they could get no response from prison officials.  Here, since Plaintiff has yet to receive any formal response to grievance number 929-03, the court finds that Plaintiff is not barred from litigating the claims that formed the basis of that grievance in this § 1983 action for failure to exhaust his administrative remedies.  This Court adopts the Magistrate Judge's recommendation on this issue.

Finally, the Court notes that despite Plaintiff's voluminous filings both before this Court and his grievances to ECI officials, Plaintiff has failed to show that his grievances concerned many of the claims made in the present case.  Specifically, nowhere in Plaintiff's grievances did he seek to force Defendants to address the issues of lack of meaningful access to the court system because of ECI's inadequate law library, ECI's refusal to provide him with new shoes, and ECI's refusal to allow him to review "tasteful nude" pictures while incarcerated.  Since from all the evidence before the Court Plaintiff never brought these complaints to Defendants' attention through the grievance process,[6] he failed to exhaust ECI's available administrative remedies, and is therefore barred from litigating those claims in a § 1983 claim in this Court.

---

[6] Plaintiff has also submitted as exhibits to his pleadings a number of Requests to Staff Member that cover a multitude of complaints about the conditions of his confinement.  However, as the Magistrate Judge correctly noted, a request to a staff member is an informal way of requesting a certain course of action, and not a remedial procedure designed to correct a wrong.  To the extent Plaintiff may have complained

The Court now turns to Plaintiff's exhausted claims.[7]

## II.     Deliberate Indifference

Plaintiff claims that Defendants were deliberately indifferent to his medical needs. Specifically, Plaintiff asserts that Defendants Patel and Alewine refused to change his medication from Nortryptiline to Neurontin, that he was unreasonably removed from daily blood sugar testing and sliding scale insulin treatments, that he was denied adequate dental care, and that he was exposed to secondhand smoke.

It is well established that deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. § 1983 as constituting cruel and unusual punishment contravening the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To prove a claim of deliberate indifference to a serious injury under the Eighth Amendment, a plaintiff must show that a defendant's "action or inaction [1] result[ed] in or creat[ed] a sufficiently serious risk of a deprivation that objectively results in denial of the 'minimal civilized measure of life's necessities' and [2] a 'sufficiently culpable state of mind.'" *Winfield v. Bass*, 106 F.3d 525, 531 (4th Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 831-34 & n. 2 (1994)). In order to be liable for deliberate indifference, the plaintiff must prove

---

about any of these issues in a Request to Staff Member letter, this was not seeking an administrative remedy, and is insufficient to allow him to litigate such a claim in this § 1983 claim if no grievance on the matter was filed. *See Davis v. Minthorn*, 2006 WL 2222700 (E.D. Tenn. Aug. 2, 2006) (holding that requests to staff member was insufficient to exhaust available administrative remedies).

[7] The Court also notes that in several of his subsequent pleadings, Plaintiff seeks to add a host of new claims which he did not mention in either his Complaint or Amended Complaint. As the Magistrate Judge correctly noted, Plaintiff was allowed to amend his Complaint twice, and was specifically notified that he would be limited to litigating the claims alleged in his final Amended Complaint. To allow him to endlessly add new claims in this action would be unfairly prejudicial to Defendants as they would be required to constantly respond to his recently-added claims, and would unreasonably delay this litigation. Therefore, Plaintiff is limited to litigating the claims he presented in his Amended Complaint, and any claims made for the first time in subsequent pleadings may not be properly litigated in this § 1983 action and are not considered by this Order.

15

that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also that he had drawn the inference. *See Young v. City of Mount Rainer*, 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants . . . actually knew of and ignored a detainee's serious need for medical care."). The mere fact that a prisoner may believe he had a more serious injury or that he required better treatment does not establish a constitutional violation. *See, e.g., Russell v. Sheffer,* 528 F.2d 318, 319 (4th Cir. 1975).

The Supreme Court has held that conduct on the part of prison physicians which may constitute medical malpractice is, on its own, not enough to sustain a § 1983 claim for deliberate indifference:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 106. *See also id.* ("[M]ere disagreements between doctor and patient about the course of treatment do not reflect 'deliberate indifference' on the part of the former . . ."); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of the doctors in missing the diagnosis does not, by itself, support an inference of deliberate indifference by the doctors to Johnson's medical needs."). The Fourth Circuit has held that treatment (or lack thereof) "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness . . . mere negligence or malpractice does not violate the Eighth Amendment." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). Similarly, alleged delays in providing adequate care also do not rise to the level of

16

deliberate indifference where the delay does not cause further injury. *Kane v. Hargis*, 987 F.2d 1005, 1009 (4th Cir. 1993).

A. Defendants' Refusal to Change Plaintiff's Medication

Plaintiff suffers from the rare condition known as neuropathic pain, which is a pain caused by no known physical trauma. It originates entirely within the nervous system itself, and is notoriously mysterious and difficult to treat, since traditional painkillers typically have no effect on the symptoms. Plaintiff asserts that the pain from this condition is so severe that it inhibits him from partaking in many activities and enjoyments.

Plaintiff asserts that Defendant Patel prescribed him Nortryptiline for this condition. Nortryptiline is a drug commonly prescribed for neuropathic pain. However, Plaintiff asserts that the Nortryptiline was ineffective and he was still in a lot of pain even after taking the medicine. He informed Patel that the medicine was not working, and that he wanted his prescription to be switched to Neurontin, which Plaintiff believed would more effectively deal with his neuropathic pain. Patel repeatedly refused, telling Plaintiff he believed Nortryptiline was a drug proven to deal with neuropathic pain and was the best course of treatment.

Plaintiff continued to request the change in medication, and filed several grievances on this matter (grievances numbered 2214-05 and 689-06). Plaintiff also filed Requests to Staff to Defendant Alewine, the treating physician, who responded that Patel's judgment as to Nortryptiline being the best course of treatment for Plaintiff was sound, and that he would not overrule Patel and prescribe Plaintiff Neurontin against Patel's judgment. However, Plaintiff concedes that in September 2006, his medication was switched from Nortryptiline to Neurontin.

Even viewing all assertions and inferences in the light most favorable to Plaintiff, the Court cannot find any material issue of fact regarding Plaintiff's claim of deliberate indifference.

17

Plaintiff's voluminous medical record clearly demonstrates that throughout the period in question, Plaintiff received regular, comprehensive medical treatment for his ailment. That it was allegedly ineffective, while unfortunate, does not raise an issue of constitutional proportions, and Plaintiff's claim of deliberate indifference in violation of his Eighth Amendment rights fails as a matter of law.

Defendants have submitted Plaintiff's voluminous medical records, which show that Plaintiff was seen and treated numerous times for his neuropathic pain. Patel prescribed him Nortryptiline, which is a medicine commonly used in the medical community to treat Plaintiff's rare condition. The fact that this medicine did not cure Plaintiff's ailment is insufficient to show deliberate indifference. There is no way to know whether Plaintiff's neuropathic pain would have been considerably worse without the Nortryptiline, or whether Neurontin would have been a more effective course of treatment than Nortryptiline. However, such inquiries are ultimately irrelevant.

At most, what Plaintiff has alleged is that Defendants were negligent in treating his condition, because they could have possibly treated it better. Such an allegation falls far short of the required standard that their conduct so "shock the conscience" that this Court would conclude that they were deliberately indifferent to Plaintiff's medical needs. On the contrary, Defendants repeatedly examined and treated Plaintiff for his neuropathic pain, and prescribed medication to treat such pain. This meets the required standard for adequate care, and Plaintiff has failed to state a cause for damages under § 1983 on these grounds.

B.  Plaintiff's Removal from Daily Blood Testing and Sliding Scale Insulin Treatment

Plaintiff's next claim of deliberate indifference is predicated on his claim that Patel removed him from twice-daily blood testing for his diabetic symptoms and placed him on less

18

regular testing.  Plaintiff also alleged that Patel removed him from sliding scale insulin treatments.  Plaintiff alleges that these treatments were the only acceptable way to control his diabetic symptoms, and that removing him from these treatments caused his diabetes symptoms to fluctuate wildly, putting him in danger of falling into a diabetic coma.

Once more, Plaintiff has failed to establish an issue of material fact on this claim.  The record shows that Patel believed that Plaintiff did not require such regular blood testing and insulin treatments.  In fact, the record shows that Patel believed that Plaintiff was abusing these treatments by repeatedly buying and consuming junk food and candy from the ECI canteen and to then "chase" the junk food by immediately administering an insulin shot to keep his blood sugar under control.  This procedure allowed Plaintiff to continue to eat unhealthy food, which meant he continued to gain weight and exacerbate his underlying health problems.  In Patel's medical judgment, removing Plaintiff from twice-daily testing and removing him from sliding scale insulin treatments would not endanger Plaintiff's health and would prevent him from eating dangerously unhealthy junk foods.

The medical records show that Plaintiff was still tested regularly, and his blood sugar did not reach dangerous levels except when Plaintiff persisted in his habit of buying and eating junk food and candy from the canteen.  While Plaintiff has made vague, self-supporting claims that this change in the course of treatment pushed his blood sugar so high that it was close to reaching the range which would put him in a diabetic coma, this is not reflected anywhere in the medical record, which contains extensive documentation about his treatment and testing.

At most, Plaintiff's allegations against Defendants constitute a claim for negligence or malpractice, which, as detailed above, is insufficient to sustain a claim for deliberate indifference.  Defendant Patel made a reasoned medical decision that Plaintiff's health would not

19

be endangered if he was removed from twice-daily testing and sliding scale insulin treatments, regularly monitored and treated Plaintiff over this time period, and the record does not show any evidence of any harmful health effects suffered by Plaintiff. Accordingly, Plaintiff has failed to establish an issue of material fact on the issue of whether or not Defendants committed deliberate indifference to his medical needs by removing him from twice-daily testing and sliding scale insulin treatments.

C.  <u>Denial of Adequate Dental Care</u>

Plaintiff's next claim is that Defendants committed deliberate indifference to his medical needs by denying him adequate dental care. Plaintiff alleges that on numerous occasions, he sought to get his teeth cleaned, but was denied. However, the record does clearly show that Plaintiff was given care for his dental problems when he signed up for sick call and went to physicians complaining of dental problems—for example, in early 2005 Plaintiff was complaining of a possible infection in his tooth and jaw, was seen and diagnosed by a physician, and was given an antibiotic to remedy the problem. Plaintiff also complains that on several occasions he has had a tooth pulled, which he alleges shows the inadequacy of the dental care given to him and other ECI inmates.

However, none of these claims establish an issue of material fact as to Plaintiff's deliberate indifference claim. This Court has previously decided at least one case involving a deliberate indifference claim for an inmate's inability get his teeth cleaned regularly:

> Plaintiff asserts that he was denied a dental cleaning, *which is a preventative procedure that does not rise to the level of a serious medical need*. Plaintiff has failed to provide any evidence to indicate that any denial of a dental cleaning has caused him to suffer any life-threatening medical problems or serious injury. Plaintiff claims that he needs to have his teeth pulled, but has not provided any evidence to support this allegation. Even viewing all assertions and inferences in

20

the light most favorable to Plaintiff, the court cannot find any material issue of fact regarding Plaintiff's claim of deliberate indifference.

*McCoy v. Willis*, 2008 WL 4221745 (D.S.C. Sept. 15, 2008) (emphasis added).  Similarly, here, Plaintiff has received multiple dental cleanings.  The fact that they were not as often as Plaintiff desired is of no consequence to the legal question at hand.

The Court next turns to Plaintiff's claim that he had several teeth pulled as a result of inadequate dental care.  Plaintiff claims that there were other possible ways of dealing with his dental problems.  However, Plaintiff is not a licensed dentist, and has produced no evidence other than his vague, conclusory, self-supporting statements that this is the case.  Furthermore, inmates are not entitled to the best medical care, or their choice of medical care—they are only entitled to the medical care necessary to keep them from suffering severe illness or injury.  *See Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

Plaintiff also ignores the simple fact that it is quite common for teeth to be pulled as a matter of medical necessity, even for those with comprehensive dental insurance who see dentists quite regularly.  This Court has previously heard and decided a case and determined that, as a matter of law, no issue of material fact is established by allegations that a dentist pulled an inmate's teeth.  *Koon v. Ubah*, 2008 WL 724041 (D.S.C. Mar. 17, 2008); *see also Woods v. Morris*, 2007 WL 2792154 (C.D. Ill. Sept. 18, 2007); *Hay v. Fernando*, 2005 WL 3447680 (D. Kan. Dec. 10, 2005).

Here, Plaintiff was provided with dental care, and the dentist decided that the best course of action for Plaintiff was to pull Plaintiff's teeth.  Plaintiff disagreed with this course of action, and in one instance refused to allow the dentist to pull the tooth in question.  However, pulling teeth is oftentimes a necessary treatment for dental problems, and what Plaintiff is really alleging

21

is that he disagreed with the dentist's judgment.  As detailed above, inmates are not entitled to the treatment of their choice, only the treatment necessary to prevent serious illness or injury.  In this case, the dentist determined that the best way to prevent Plaintiff from experiencing further dental problems was to pull his teeth.  Plaintiff may have been unhappy about it, but he was given diagnosis and treatment from the dentist when he needed it, and this is more than sufficient to satisfy the standard of minimally adequate medical care.  Therefore, Plaintiff has failed to establish an issue of material fact on this claim.

    D.  <u>Secondary Smoke</u>

Plaintiff's next claim is that his constitutional rights were violated because he was exposed to secondary smoke while in prison, which he claims exacerbated his health and respiratory conditions.  According to Plaintiff, his cell was placed on a unit of cells in which inmates were allowed to smoke.  He claims he was exposed to secondary smoke, which exacerbated his respiratory problems, posed serious health problems, and constituted deliberate indifference towards his serious medical conditions by Defendants.

Plaintiff has again, however, failed to establish an issue of material fact as to this particular claim for relief under § 1983.  The Supreme Court of the United States has held that a prisoner may file a § 1983 claiming that prison officials have shown deliberate indifference to his legitimate medical needs by exposing him to unreasonably high levels of secondary smoke.  *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993).  However, the Court also set a very high bar for what an inmate must allege for such a claim to succeed:

> [D]etermining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [secondary smoke].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so

> grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id*. at 36 (emphasis in original).  Therefore, Plaintiff must allege such extreme exposure to secondary smoke that it would be a constitutional violation to expose anyone to such a high level.  In *Helling*, the inmate was put in a two-person cell with another inmate who smoked five packs of cigarettes per day, which produced an extraordinarily high amount of secondary smoke in a small, enclosed space.

Here, in contrast, Plaintiff is complaining of secondary smoke from other inmates who are smoking outside of his room in the hallway.  Smoke is limited to certain areas in this area of ECI, and inmates are encouraged to report any inmates observed smoking outside of these designated areas.  Plaintiff has not alleged any facts which would make the level of secondary smoke to which he was exposed "so grave that it violates contemporary standards of decency to expose *anyone* to such a risk."  *Id*.  Even taking into account Plaintiff's medical conditions, the record shows that ECI policy did not expose him to an unreasonably high level of secondhand smoke that society would not be willing to tolerate.  Furthermore, Plaintiff ignores the fact that he was assigned a cell in this area at all because he was a smoker at the time, and records show that Plaintiff was buying cigarettes at the ECI canteen before filing his grievance on this matter.

Plaintiff has therefore failed to allege that his exposure to secondary smoke posed such an extreme health risk that society would not tolerate this, and his claim for relief under § 1983 on this ground therefore fails as a matter of law.

E.  Failure to Provide Plaintiff with a Healthy Diet

Plaintiff's final deliberate indifference claim is that he is entitled to relief under § 1983 because the diet provided to him contains salty food and processed meat, which is bad for his

23

diabetic condition.  Plaintiff alleges that he has consistently requested that Defendants provide him with a diet meal of healthier food, which would better enable him to control his diabetic symptoms.  Defendants repeatedly denied this request, and do not have a program to provide special diet meals to inmates as Plaintiff requests.

The Fourth Circuit has held that a correctional facility is not obligated to provide a special meal to any inmate if an inmate can voluntarily refrain from eating certain offensive portions of meals and remain healthy.  *Abernathy v. Cunningham*, 393 F.2d 775, 778 (4th Cir. 1968).  ECI is a prison, not a health spa or a restaurant, and given the logistical and economical constraints it is simply unfeasible to expect a correctional institution to provide tailor made meals for each individual inmate's needs and desires.  Defendants are not obligated to put Plaintiff on a weight loss program or design and prepare special foods for him.  The Constitution only compels them to provide him with a nutritionally balanced meal that will maintain his health, and his self-supporting, conclusory statements that the regular meals served to ECI's general population exacerbate his diabetic symptoms are insufficient to establish an issue of material fact.  This is particularly true in light of the fact that Plaintiff has continued to buy and consume soda, junk food, and candy at ECI's canteen.  The objective evidence shows that ECI serves all inmates a balanced meal that meets nutritional standards, and that Plaintiff has regularly consumed this meal and his blood sugar has stayed within reasonable levels despite some fluctuations.  Plaintiff is therefore not constitutionally entitled to be provided with a diet/weight loss meal, and the fact that Defendants denied these requests does not give rise to a valid claim for relief under § 1983.

Accordingly, Plaintiff has failed to establish an issue of material fact as to any of his claims for deliberate indifference, and therefore all claims for relief under § 1983 because of Defendants' alleged deliberate indifference fail as a matter of law.

**III.     Plaintiff's Confinement in SMU**

Plaintiff next alleges a host of claims that Defendants violated his constitutional rights by placing him in ECI's Special Management Unit ("SMU"), and that many of his constitutional rights were violated while he was in SMU.

A.   Defendants Failed to Follow SCDC Procedures in Placing Him in SMU

Plaintiff's first claim is that Defendants failed to follow proper SCDC procedure and protocols when they decided to place him in SMU.   According to Plaintiff, Defendants inappropriately failed to follow the standard disciplinary procedure process.   He also alleges that Defendants treated him more harshly than they generally treated other inmates, and he further claims that Defendant Chavis, the grievance coordinator, both initiated the action and took part in the decisionmaking process to put him in SMU, which was in violation of SCDC procedures.

However, failure to follow procedures is not actionable in and of itself.   In order for a failure to follow internal procedures to form the basis of a § 1983 civil rights claim, the action must have independently violated an inmate's constitutional rights.   *Keeler v. Pea*, 782 F. Supp. 42 (D.S.C. 1992) (finding that § 1983 action failed as a matter of law where inmate alleged he was put in lockup despite inmate advisory council finding the inmate not guilty).   The Fourth Circuit has held that where state law or correctional policies grant an inmate more procedural protections than are guaranteed under the United States Constitution, a violation of those state law procedures does not raise a federal issue unless it also violates the Constitution.   *Riccio v. County of Fairfax, Virginia*, 907 F.2d 1459, 1469 (4th Cir. 1990).

The Court also notes that the Supreme Court has explicitly held that decisions made by prison officials are due a substantial amount of deference:

25

> The Herculean obstacles to effective discharge of these duties (of prison administrators) are too apparent to warrant explication.  Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.  Judicial recognition of that fact reflects no more than a healthy sense of realism.  Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

*Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974).

Therefore, this Court will not substitute its judgment for the appropriate way to run a correctional institution, or the appropriate way to separate certain inmates from the general population, for the judgment and decisionmaking ability of SCDC officials unless it is absolutely necessary to do so to safeguard inmates' constitutional rights.  The Court further notes that there is no constitutional right to remain in the general population of a prison, and the mere act of putting Plaintiff in SMU, on its own, cannot form the basis of a claim for relief under § 1983.

In this case, ECI officials were concerned about Plaintiff's letter, given that it spoke quite explicitly about the danger of inmates escaping and committing retaliatory acts of violence against the citizens of the surrounding area.  They also worried that Plaintiff's depiction of his fellow inmates as depraved, bloodthirsty violent offenders and child molesters who wanted nothing more than to escape from ECI to commit more acts of violence would anger his fellow inmates, possibly putting Plaintiff in some sort of danger.  While Plaintiff may doubt Defendants' motivation for putting him in SMU, the fact is that neither the Plaintiff nor this Court know as much about the dangers and concerns of corrections administration as Defendants.  Had there been an inmate escape and harm had come to a nearby community member, there would have been outrage and accusations that Defendants could have done more

26

to stop it.  Similarly, had Plaintiff been the subject of some sort of retaliatory harm by one of his fellow inmates as a result of his letter to the newspaper, Defendants would have been blamed for insufficiently protecting Plaintiff.

Instead, Defendants opted to move Plaintiff to SMU for a period of 75 days while they investigated these matters.  Plaintiff was not treated cruelly and was afforded food, clothing, shelter, medical care, and all the rest of the necessities to which he was entitled while in segregation.  After a time, Defendants concluded the inquiry and moved Plaintiff back to ECI's general population.  Even if Defendants failed to follow all of their own internal procedures, Plaintiff's relocation to SMU did not violate his rights under the United States Constitution, and therefore may not form the basis of a civil rights claim under § 1983.

Plaintiff next makes a number of specific claims as to constitutional rights which he alleges were violated while he was in ECI's SMU.  The Court addresses these claims individually.

   B.  Lack of Shower Opportunities

Plaintiff has alleged that while he was in SMU, Defendants failed to adequately provide him with adequate access to showers.  Plaintiff asserts that he was only allowed to shower after roughly ten days in SMU, and after that an average of approximately once per week.  Plaintiff asserts that this was degrading and amounted to cruel and unusual punishment in violation of the Eighth Amendment.

However, the law is clear that bathing opportunities may be severely reduced or curtailed without violating an inmate's Eighth Amendment rights.  *See, e.g.*, *Shakka v. Smith*, 71 F.3d 162, 168 (4th Cir. 1995) (inmate's constitutional rights were not violated where he was not given access to shower for three days after having feces thrown on him by fellow inmates, because he

27

had access to water with which to clean himself); *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir.), *cert. denied*, 488 U.S. 908 (1988) (holding that restricting inmates in segregated confinement to one shower per week did not violate their constitutional rights).  Since the facts of this case are not materially distinguishable from *Davenport* and other cases in which the opportunities to shower for inmates in segregated confinement were severely reduced, this Court has no choice but to find that Plaintiff's constitutional rights were not violated by his restricted showering opportunities.

C.  Plaintiff's Fall

Plaintiff also alleges that while in SMU, he fell and hurt his arm, and Defendants committed deliberate indifference in allowing him to fall and not immediately providing him proper treatment.

However, Plaintiff has failed to specify more than a minimal injury from this fall.  The initial report filed indicated that although Plaintiff had, in fact, fallen in his cell, he had suffered no permanent or serious harm.  Plaintiff contends that he has continued to request cortisone shots, but the medical records show that Plaintiff has been seen and treated numerous times since his fall, and that he sustained no serious injury as a result.  As the Fourth Circuit has held, a de minimis injury cannot form the basis for a constitutional claim.  *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc).  Since Plaintiff has not produced any evidence beyond vague conclusory statements that he was in fact seriously injured by the fall, the Court must conclude that he has failed to establish an issue of material fact as to whether or not Defendants violated any of his constitutional rights in their treatment of him after he fell onto the floor in his cell.

D. Lack of Recreation

Plaintiff has also alleged that his constitutional rights were violated because he was not allowed outside of his cell at all during his seventy-five days in SMU.

"[I]n certain circumstances, restricting inmates' opportunities for physical exercise constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980). Courts have generally set the bar very high for how severe the deprivation of exercise must be in order to form the basis of a constitutional claim. There is, for example, no absolute right to have access to the outdoors, and access to the outdoors may be severely restricted or curtailed so long as inmates retain the ability to get some form of recreation within the institution. *See, e.g.*, *Chavis v. Fairman*, 1995 WL 156599 at *5-*6 (7th Cir. Apr. 6, 1995) ("Generally, even dramatic restrictions on outdoor exercise do not violate the Eighth Amendment . . . so long as prisoners have ample opportunity to enjoy indoor activity.").

The Fourth Circuit has held that in order to sustain a § 1983 claim for lack of exercise, a plaintiff must produce evidence "that he has sustained any serious or significant physical or emotional injury as a result of these conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). The Fourth Circuit has also limited constitutional violations for this count to lack of exercise, not a mere lack of recreation. *Id*. at n. 7.

According to Plaintiff, he was in confined in his SMU cell for 75 days, during which time he was allowed no exercise whatsoever. In fact, the only time Plaintiff was even allowed to leave his cell was to take a shower approximately once per week. However, Plaintiff's claims of

physical harm are conclusory and unsupported by the record.[8]  Furthermore, while Plaintiff has sought treatment for depression during his confinement at ECI, he was seeking mental health treatment at the time of his transfer, and has not specified how his time in SMU affected or exacerbated his depression.  Therefore, this Court must conclude that Plaintiff has failed to establish an issue of material fact as to whether or not he suffered any serious physical or emotional injury as a result of his inability to exercise while confined in SMU.

Furthermore, the Court reiterates that the Fourth Circuit has distinguished exercise from recreation.  *Strickler*, 989 F.2d at 1381 n.7 ("We, like the district court, consider whether Strickler was denied exercise.  Notably, however, as the district court emphasized, Strickler does not even specifically allege that he was deprived of such a right [but instead claimed he was being denied 'adequate recreation'].")  Therefore, it seems clear that while there is a constitutional right to be provided with some sort of minimal opportunity to exercise, there is no constitutional right to "recreation."  Notably, here, Plaintiff repeatedly claims that he was denied the right to "recreation" while in SMU.

Exercise is the act of physical activity or exertion.  Recreation is an activity designed to provide relaxation or enjoyment.  "Lack of exercise may rise to a constitutional violation in certain limited circumstances 'where movement is denied and muscles are allowed to atrophy [and] the health of the individual is threatened.' "  *Ramos*, 130 F.3d 754, 763 (7th Cir. 1997) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)).  Courts have held that there is no need to provide opportunities for exercise outside of one's cell if a person is capable of performing exercise within his or her cell.  *Id*. at 764 (holding that no constitutional violation had

---

[8] In fact, as stated above, the records and affidavits of his physician show that many of Plaintiff's diabetic symptoms actually improved as a result of his transfer to SMU, apparently largely due to the fact that Plaintiff was no longer able to buy and consume unhealthy soda and snacks from the ECI canteen.

occurred when inmate was confined to his cell without exercise for 70 days, but could have conducted exercises such as push-ups, sit-ups, and jogging in place within his cell).  Here, there is no medical evidence that Plaintiff's health deteriorated due to a lack of exercise, and Plaintiff has failed to specify how his health deteriorated.  Furthermore, the Court notes that Plaintiff is, by his own admission, very obese and confined to a wheelchair, and was apparently unable to perform most basic forms of exercise, whether he was in his cell or not.  Plaintiff's capability for physical activity was seemingly limited to standing and walking very short distances, which could be accomplished in even a very small cell.  Accordingly, confinement to his cell in SMU did not deprive Plaintiff of his constitutional right to the opportunity for physical exercise, and Plaintiff has no actionable claim under § 1983 on these grounds.

E.  <u>CPAP Machine</u>

Plaintiff's next claim is that while he was in SMU, he was denied an electrical cord for his CPAP breathing machine during the day.  Plaintiff suffers from sleep apnea, a disorder characterized by such severe difficulty breathing during sleep, which can lead to them feeling constantly tired and fatigued.  Plaintiff has been provided with a CPAP machine, which uses pressure to force air through the breathing passages into the lungs so the sleep apnea sufferer gets sufficient oxygen and is allowed to sleep adequately.

According to Plaintiff, he was provided with a CPAP machine, which he was allowed to maintain while he was in SMU.  However, he alleges that Defendants removed the electrical cord for his CPAP machine during the day, and only allowed him access to it at night, so he was unable to use the machine during the day.  While Plaintiff makes countless statements about how he could have died at any time due to this deprivation, the records show no medical ill effects from his inability to use his CPAP machine during the day.

While Defendants did not directly account for why they made the decision to remove Plaintiff's electrical cord during the day, there are a number of reasons they may have had for doing so. They may have simply been worried that Plaintiff would keep the machine running all day if they didn't, and wanted to save the electricity and attendant costs. They may have also, given Plaintiff's depression, been worried about the potential for a suicide attempt, and decided to remove the cord as a precaution. As stated above, this Court should defer to the decisions of professional state corrections officers when it comes to decisions about the correct way to run their institution unless their decisions result in a clear violation of an inmate's constitutional rights.

In this case, it did not. The CPAP machine was specifically provided in order that Plaintiff be able to sleep soundly at night. Defendants provided him with power for the machine at night, so he would be able to avoid the worst of the ill effects of sleep apnea. In doing so, they were looking out for his best interests and showing attention to and accommodating his legitimate medical needs. However, Defendants decided to remove the power cord for the machine from his room during the daytime when he was not sleeping. Because he was given access to the machine at night when he needed it, and has neither shown nor alleged how he was harmed by not being able to use the CPAP machine during the day, the Court must conclude that this was not a constitutional violation, and therefore cannot form the basis of a valid claim for relief under § 1983.

F. ADA Violations

Plaintiff's final claim is that the conditions of his confinement in SMU violated Title II of the Americans with Disabilities Act ("ADA"). Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied

32

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Supreme Court has construed the term "public entity" to include state correctional institutions.  *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).

Plaintiff may not allege ADA actions against any defendant in his or her individual capacity, because the ADA does not authorize such suits.  *Garcia v. SUNY Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Accordingly, Plaintiff may only bring this claim against individual Defendants in their official capacities.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Therefore, any action against individual Defendants in their official capacities and the state and state agencies are barred by sovereign immunity unless Congress has explicitly created an exception.

The ADA does, however, create a limited exception to state sovereign immunity.  A disabled inmate may sue a state or state institution for ADA violations which also violate the Fourteenth Amendment.  *United States v. Georgia*, 546 U.S. 151, 159 (2006).  Since the relevant provisions of the Eighth Amendment are made applicable to the states by the Fourteenth Amendment, Plaintiff may only state an ADA claim against Defendants if he has alleged that his Eighth Amendment rights were violated.

### 1.  *Plaintiff's Medical Claims*

Plaintiff alleges that Defendants violated the ADA by failing to provide him with adequate medical care for his various ailments and disabilities.

However, as previously explained, state sovereign immunity is only abrogated on ADA claims if the alleged ADA violation also violates an inmate's constitutional rights. In this case, therefore, Plaintiff's claims that his ADA rights were violated by inadequate medical care is identical to his claims that Defendants were deliberately indifferent to his serious medical needs in the care they provided to him. Since this Court has already determined that Plaintiff has not established an issue of material fact on his Eighth Amendment deliberate indifference claims, the Court must also logically conclude that his ADA claims regarding his medical treatment fail as a matter of law.

### 2. Plaintiff's Complaints About His Cell's Accommodations

Plaintiff also alleges that his SMU cell was too tight and cramped for him to adequately move his wheelchair around the cell, that it was not equipped with bars to help him lift himself up, and that he had difficulty using the toilet and the washbasin. However, it is not sufficient for Plaintiff to show that the accommodations of his cell did not comply with the requirements of the ADA—he must show that the conditions of his cell so deprived him of the essential needs of habitation that they violated his Eighth Amendment rights, as applied to the states under the Fourteenth Amendment.

Plaintiff has failed to establish an issue of material fact as to whether or not Defendants did not reasonably accommodate his disabilities. The fact is that Plaintiff was assigned to a room that accommodated his disabilities while he resided in ECI's general population, but his SMU cell did not have all the same accommodations. As a practical matter, it is simply unrealistic to expect ECI to be able to duplicate the degree of accommodation they are able to provide with general cells, which can be specifically tailored to accommodate an inmate's

specific disabilities, with a segregation cell, which would have to then accommodate all possible disabilities which could afflict an inmate.

The larger issue, however, is that Plaintiff has simply failed to establish an issue of material fact as to precisely how his temporary cell was so unaccommodating of his disabilities that it violated his constitutional rights.  While Plaintiff's mobility within the cell in his wheelchair was allegedly somewhat limited, he could still move in the chair to all amenities he needed to reach.  Furthermore, Plaintiff is able to move very short distances without the assistance of the wheelchair, and thus was capable of the limited movement he needed to reach the sink and toilet within his small cell.

Accordingly, Plaintiff has failed to establish an issue of material fact with regard to his claim for relief under the ADA, and these claims fail as a matter of law.

## IV.     Qualified Immunity

Furthermore, the Magistrate Judge also recommended, correctly, that Defendants' Motions for Summary Judgment be granted because all Defendants are entitled to qualified immunity.  The doctrine of qualified immunity offers some protection to a government employee being sued in his or her individual capacity.  The Supreme Court has held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Since all Defendants are government officials being sued in their individual capacities for actions taken while they were acting in an official capacity, the only remaining question as to qualified immunity for Defendants is whether or not Defendants violated "clearly established

statutory or constitutional rights of which a reasonable person would have known." As the Court has previously explained, Plaintiff has failed to establish an issue of material fact on any of his allegations of constitutional violations. Since none of Defendants violated Plaintiff's constitutional rights, Defendants are also shielded from liability by qualified immunity.

## V.    State Law Claims

Plaintiff has also alleged in this action a number of claims under South Carolina disability statutes. However, as the Magistrate Judge noted, this Court would only have supplemental jurisdiction over such claims if Plaintiff had stated a claim for relief under federal law. Federal law provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367.

In the present case, as explained above, Plaintiff has failed to establish an issue of material fact on any of his claims under § 1983. Since these were the only claims Plaintiff brought under federal law, and therefore the only claims over which this Court has original subject matter jurisdiction, the only claims which remain are Plaintiff's claims brought under state law. Therefore, this Court declines to exercise supplemental jurisdiction over those claims, which would more properly be brought before a state court. The statute of limitations on those actions has tolled while the present action is pending, and Plaintiff is therefore free to file those actions in the appropriate state court.

## VI.    Plaintiff's Motion for Judicial Notice

Plaintiff has also filed a "Motion for Judicial Notice of Issues Not Addressed in the Report and Recommendation and Rule 56(c) Motion." In this document, Plaintiff asserts that the

R&R of the Magistrate Judge did not address several of his claims made in his pleadings and objections.  However, in this Order, this Court examined all of Plaintiff's claims, and found that Plaintiff failed to establish an issue of material fact on any of them.

Accordingly, since all claims made by Plaintiff in his pleadings, objections, and the Motion for Judicial Notice fail as a matter of law, this Motion is rendered moot.

## CONCLUSION

It is, therefore **ORDERED**, for the foregoing reasons that Plaintiff's action for civil rights relief pursuant to 42 U.S.C. § 1983 which have not been exhausted be **DISMISSED** without prejudice.  It is further **ORDERED**, for the foregoing reasons that Defendants' Motion for Summary Judgment be **GRANTED**, with prejudice, with respect to Plaintiff's claims for civil rights pursuant to 42 U.S.C. § 1983 which were properly exhausted.  Since all Plaintiff's claims have been resolved in this Order, it is further **ORDERED**, for the foregoing reasons, that Plaintiff's Motion for Judicial Notice be **RENDERED MOOT**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**March 10, 2009**

37